1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL P. MARTINEZ, | )  1:10-cv-02408-SKO |
| | ) |
| | )  **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | )  **SOCIAL SECURITY COMPLAINT** |
| | ) |
| v. | )  (Doc. 1) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

## I.  BACKGROUND

Plaintiff Samuel P. Martinez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 8, 9.)  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1972, completed the 12th grade, and previously worked as a general laborer, grape stacker, and performed jobs involving receiving/stocking and shipping/receiving. (Administrative Record ("AR") 63, 193, 236.)  On December 28, 2009, Plaintiff filed an application for SSI, alleging disability beginning on December 10, 2007, due to a dislocated disk and pinched nerve in his back.  (AR 222-29, 235.)  Plaintiff also indicated that he had broken his ankle, which required surgery, and he had a recurring infection in his ankle.  (AR 24, 54.)

### A.     Relevant Medical Evidence

Between March 18, 2004, and December 1, 2005, Plaintiff was seen by Thomas R. Evans, M.D., at Tulare Community Health Clinic ("Tulare Clinic").  (AR 359-93.)  Plaintiff was regularly treated for chronic back pain and lumbar disk disease, and was occasionally treated for sciatica of the left leg, reflux, internal derangement of the right knee.  (AR 359-93.)  On December 1, 2005, Plaintiff was "trying to get on TCMS insurance" and was "pending seeing a specialist."  (AR 359.)  Plaintiff had been unable to work since October 2003.  (AR 359.)

On November 30, 2006, Plaintiff was seen by Anil K. Patel, M.D., at Tulare Clinic after he "missed a step and sprained his ankle."  Plaintiff complained of a "lot of pain" and was unable to put weight on his left ankle.  An x-ray taken at Tulare District Hospital ("Tulare Hospital") indicated that there was "evidence of a bimalleolar fracture of the left ankle with soft tissue swelling."  (AR 318.)  The next day, on December 1, 2006, Jour R. Lee, M.D., operated on Plaintiff's ankle at Tulare Hospital and performed an "[o]pen reduction internal fixation" including inserting a plate and screw into the ankle.  (AR 310, 312, *see also* AR 317.)  Plaintiff was seen by Dr. Lee for post-surgical care. On December 14, 2006, the sutures were removed and the "wound [was] healing, but there [was] a blister on the lateral aspect of the lateral wound."  On December 21, 2006, Dr. Lee indicated the Plaintiff's wound was "healing slowly, but there [was] no infection."

On February 7, 2007, Dr. Lee reported that Plaintiff "had a slow healing of lateral malleolus. There [was] superficial skin slough [with] dehiscence, but no[] dip into the plate and screw.  This

has been treated with debridement[2] in the office with no avail." (AR 316.)  As such, Plaintiff was required to "return[] to [the] OR [operating room] to remove the hardware from lateral malleolus to enhance this healing and prevent infection." (AR 316.)  Dr. Lee operated on Plaintiff on February 8, 2007, to remove one plate and seven screws, and noted that there was "no drainage from the deep wound.  The ankle seem[ed] to be minimally swollen but there [was] no infection." (AR 347.) Plaintiff's sutures were removed on February 23, 2007.  (AR 346.)

On March 14, 2007, Dr. Lee indicated that Plaintiff had a "[l]eft ankle post infection wound with necrotic tissue." (AR 345.)  A debridement of the skin and subcutaneous tissue was performed. On March 23, 2007, Plaintiff's wound was "healing fine but still [had] some small amount of necrotic tissue." (AR 343.)  On April 6, 2007, Dr. Lee noted that the wound was "slow healing" because there was "underneath necrotic tissue that [had] not yet liquefied." (AR 342.)  Another debridement was performed on April 12, 2007.  (AR 341.)

On April 24, 2007, Jonathan M. Gurdin, M.D., performed an orthopedic evaluation at the request of the Social Security Administration.  (AR 324-25.)  Dr. Gurdin indicated that Plaintiff's low back was reportedly injured in an automobile accident in 1992 and, after undergoing an MRI, he was informed that he had a bulging disc and that surgery was not advised.  (AR 324.)  Plaintiff's condition was "aggravated by a recent fracture of the left ankle with delayed healing." (AR 324.) Plaintiff indicated that "[w]alking on crutches was difficult for him" and that Plaintiff was using a wheelchair at the time.  Plaintiff complained of "constant aching in the lumbar region which worsens with activity including standing, sitting, bending, lifting and twisting." (AR 324.)  Upon examination, Plaintiff "was unable to walk and could barely transfer to the table."  Plaintiff complained of "mild tenderness" in his back and Dr. Gurdin noted that there was "some tightness." (AR 325.)  Plaintiff had "low back pain" upon straight leg raising.  Plaintiff's lower leg had "chronic swelling about the ankle and foot with moderate pitting edema . . . There [was] a 3 cm. open wound laterally about the ankle." (AR 325.)  Dr. Gurdin diagnosed Plaintiff with recent fracture of the left

---

[2] Debridement is defined as "the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed." *Dorland's Illustrated Medical Dictionary* 481 (31st ed. 2007)

ankle with open reduction internal fixation, an infection, and delayed wound healing; lumbar myofascitis with probable disc disease; and obesity. (AR 325.) Dr. Gurdin opined that Plaintiff's ankle condition was "aggravating his back condition" and that he "may require further surgery on the ankle including another debridement and possibly skin grafting. Once the ankle has healed he should begin an aggressive program of physical therapy including treatment for the back." (AR 325.) Plaintiff was confined to a wheelchair "[a]t the present time" and was unable to do any walking, standing, lifting, or carrying. (AR 325.)

On May 11, 2007, State Agency physician Sadda V. Reddy, M.D., reviewed Plaintiff's records and opined that Plaintiff's ankle condition would be "non-severe" by November 2007, twelve months after the onset of the fracture. (AR 326-27.)

On July 26, 2007, Dr. Lee performed another debridement. (AR 340.) On September 7, 2007, Dr. Lee noted that the swelling on Plaintiff ankle was "almost gone," that the wound was "healing well," but that Plaintiff was "still limping on the left leg and complains of left knee pain." (AR 397.) Dr. Lee opined that Plaintiff could return to work in October 2007.

On September 28, 2007, State Agency physician John G. Wheeler reviewed the evidence in Plaintiff's file and affirmed Dr. Reddy's assessment. (AR 348.)

On October 16, 2007, Plaintiff was seen by Arnold Weldon, M.D. for follow-up care to his ankle surgery. (AR 354.) Dr. Weldon noted that Plaintiff's ankle had "minimal swelling." (AR 354.) On November 13, 2007, Plaintiff indicated that he had been having "daily pain since November 2006" and that "[d]ue to this chronic pain, [Plaintiff] states he is not able to work." (AR 352.) Dr. Weldon diagnosed Plaintiff with chronic low back pain and left ankle pain. (AR 352.) An examination of Plaintiff's ankle showed a surgical scar, but the left foot was "okay." (AR 352.) On December 26, 2007, Plaintiff complained to Dr. Weldon that his ankle pain was "not going away and [was] actually . . . getting worse." (AR 350.) Dr. Weldon noted that there was a "slowly healing surgical scar in the left lateral aspect of the left ankle." (AR 350.)

On February 19, 2008, Dr. Weldon checked Plaintiff's ankle again and noted that Plaintiff had been "seen by [an] orthopedic surgeon who[,] according to him[,] told him that he will have to live with it, with the swelling and the pain, and no specific treatment was recommended." (AR 433.)

Dr. Weldon advised Plaintiff to "apply for SSI due to the fact that []he states []he cannot work." (AR 433.) Dr. Weldon assessed Plaintiff with chronic back pain and ankle pain and prescribed pain medication of hydrocodone, ibuprofen, and Ultram. (AR 422-33.) On June 6, 2008, Dr. Weldon noted "mild edema but no unstable joint" in Plaintiff's left ankle. (AR 427.) On July 7, 2008, Plaintiff's ankle had "quite a bit of swelling and tenderness." (AR 425.) On October 24, 2008, Plaintiff's ankle showed "swelling" and was "tender with palpation." (AR 420.) On December 17, 2008, Plaintiff had an "open sore" on his ankle "measuring 1 cm x 0.5 cm in diameter with some serious drainage." (AR 418.)

On January 13, 2009, Dr. Weldon wrote a letter addressed "To Whom It May Concern." (AR 417.) Dr. Weldon's letter stated: "Mr. Sammy Martinez has suffered from chronic left ankle pain status post open reduction and internal fixation. The patient is also suffering from chronic wound infection requiring treatments from time to time. It appears that his condition to be (sic) stable, stationary, but disabling." (AR 417.)

On February 11, 2009, Dr. Weldon noted that Plaintiff's "left ankle pain and drainage stopped a few days ago" but that there was a "scab at the site of the opening" and that "unfortunately, the pain increased." (AR 453.) Dr. Weldon noted swelling and tenderness, but no drainage, of the ankle. (AR 453.)

On March 27, 2009, an x-ray of Plaintiff's lumbosacral spine was performed at Kaweah Delta Medical Center. (AR 443.) The findings indicated that there was a "[s]omewhat narrowed disc space at the L5-S1 level" but that the "examination otherwise [was] within normal limits." (AR 443.)

On March 29, 2009, a comprehensive orthopedic evaluation was performed by Dale H. Van Kirk, M.D. based on Plaintiff's chief complaints of low back pain and left ankle fracture with residual pain. (AR 438-42.) Dr. Van Kirk conducted a physical examination of Plaintiff, including testing his range of motion. (AR 440-41.) Dr. Van Kirk noted that Plaintiff "moan[ed] and groan[ed] throughout the examination, mainly referencing his back" and that he "appear[ed] to exaggerate moderate to a marked degree his symptoms, mainly his back and also the left ankle." (AR 440.) Dr. Van Kirk reported that there was no pain or difficulty with the range of motion of

5

Plaintiff's spine, but on testing Plaintiff's lumbar region he "moan[ed] and groan[ed] and appear[ed] to have great difficulty moving and [was] unwilling to move much." (AR 441.) Plaintiff appeared to have "moderate pain with attempts at motion" of his ankle, and was "unwilling or unable to move the ankle farther." (AR 441.) Dr. Van Kirk noted Plaintiff's functional assessment, and opined that Plaintiff could sit four hours out of an eight-hour day, if Plaintiff could get up every half hour to reposition himself; should use a lumbosacral corset for his back, a quad cane, and an ankle brace; could lift 10 pounds frequently and 20 pounds occasionally; could perform no postural activities; had no manipulative restrictions; and should not be required to work in cold and/or damp environments. (AR 442.)

On the same date, Dr. Van Kirk completed a check-box form. (AR 444-50.) Dr. Van Kirk indicated that Plaintiff could lift and carry up to 10 pounds continuously, up to 20 pounds frequently, and up to 50 pounds occasionally. (AR 444.) Dr. Van Kirk opined that Plaintiff could sit, stand, and walk for 45 minutes at one time and for four hours in an eight-hour day, and needed a cane to ambulate. (AR 445.) Plaintiff had no limitations on the use of his hands and right foot, but could never use his left foot to operate foot controls due to his ankle injury. (AR 446.) Plaintiff could occasionally climb stairs and ramps and frequently balance, but could never stoop, kneel, crouch, or crawl. (AR 447.) Dr. Van Kirk noted that Plaintiff had environmental limitations and should never be exposed to unprotected heights, humidity and wetness, extreme cold, and extreme heat. (AR 448.) Plaintiff needed a quad cane to ambulate and could not walk at a reasonable pace over rough and uneven surfaces, but could perform other activities such as shopping, traveling, using public transportation, climbing a few steps, preparing simple meals, caring for his personal hygiene, and handling papers and files. (AR 449.)

Between May 7, 2009, and May 14, 2010, Plaintiff was seen by Dr. Weldon for treatment of his chronic ankle pain. (AR 462-481.) Dr. Weldon found Plaintiff's left ankle to be "swollen and tender," and having "diffuse tenderness with palpation" with "decreased range of motion." (AR 462-80.) On May 14, 2010, Dr. Weldon noted that Plaintiff had been "disabled" since his ankle surgery. (AR 462.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (120-23, 125-29, 130.)  On February 10, 2009, ALJ Sharon Madsen held a hearing where Plaintiff and a vocational expert ("VE") testified; Plaintiff appeared without counsel. (AR 43-71.)

On August 7, 2009, the ALJ issued a decision finding that Plaintiff (1) had severe impairments of status post displaced bimalleolar fracture with open reduction and internal fixation, status post multiple ankle wound debridements, and lumbar degenerative disc disease ; (2) did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments; (3) had the residual functional capacity ("RFC")[3] to lift/carry 10 pounds and occasionally 20 pounds, stand and walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday with a stand/sit option, and occasionally stoop, crouch, crawl, climb, and squat; (4) was incapable of performing past relevant work; but (5) could perform other work that existed in significant numbers in the national economy.  (AR 88-97.)  Based on these findings, the ALJ concluded that Plaintiff was not disabled.  (AR 97.)

On December 4, 2009, the Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded the matter to the ALJ for reconsideration. (AR 98-102.)  The Appeals Council ordered the ALJ to obtain additional evidence concerning the claimant's left ankle impairment, further consider Plaintiff's maximum RFC and provide appropriate rationale with specific references to the evidence of record to support the assessed limitation, further consider the non-treating source opinions and explain the weight given to such opinion evidence, and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base.  (AR 101.)

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

On remand, another hearing was held on August 26, 2010, where Plaintiff and VE Thomas Dachelet testified; Plaintiff was represented by counsel. (AR 16-42.) Plaintiff testified that he was single, lived in an apartment with his mother, and was receiving food stamps. (AR 20.) Plaintiff stated that he had a driver's license but did not drive; instead, his niece would drive him places. (AR 20.) Plaintiff was a high school graduate and took a course in energy technology. (AR 20-21.) Plaintiff testified that he needed help showering, doing laundry, and preparing his meals, but he was able to use the microwave, make a sandwich, and fold his clothes. (AR 21-22.) Plaintiff did not participate in any social activity or attend church, although sometimes his relatives would visit him. (AR 22.) Plaintiff could no longer participate in any hobbies. (AR 22.) Plaintiff's typical day consisted of getting up, taking medication, showering, lying down because he was drowsy from the medication, watching television for "maybe 20 minutes," and then lying down again. (AR 22.) Plaintiff indicated that when he was lying down, he was "napping" and had his "foot elevated." (AR 22.)

Plaintiff testified that he previously performed shipping and receiving work at Sears, Wal-Mart, Pep Boys, and United Furniture Outlet, filling orders and stocking items using manual labor. (AR 23-24.) Plaintiff used to lift "[p]robably over a hundred pounds." (AR 23.)

Plaintiff stated that his ankle was swelling throughout the day and "[t]hat never goes away." (AR 24.) Plaintiff said that he had a "pin" on his left side that was "still infected right now." (AR 24.) Plaintiff indicated that his doctor was "talking about" taking the pin out, but he was unsure if it was going to happen. (AR 24.) Plaintiff's infection had been "going on since [he] had [his] surgery." (AR 24.) Plaintiff testified that he was currently on antibiotics. (AR 24.) Plaintiff did not attend physical therapy for his ankle injury because "there was no insurance to cover that." (AR 24-25.) Plaintiff could "barely bear very much weight" on his ankle, and used a cane even in his house. (AR 25.)

Plaintiff testified that he had "muscle spasms" in his back and that he was most uncomfortable sitting and standing, but it was also uncomfortable to lie down. (AR 25.) Plaintiff was on daily medication for the pain, as well as for high blood pressure. (AR 26.) Plaintiff could only sit for five to ten minutes due to his back pain before needing to stand up, could stand for

1   "about" ten minutes, and could walk "maybe" ten to fifteen steps before needing to pause.

2   (AR 26-27.) Plaintiff stated that he could lift "a little more than ten pounds." (AR 27.) Plaintiff was

3   unable to walk up a flight of stairs and could only walk up "maybe one to two" steps "with

4   assistance." (AR 29.) Plaintiff stated that cold weather would "make [his] ankle swell even more,"

5   and would also affect his lower back. (AR 30.) Plaintiff indicated that his doctor wanted to perform

6   tests on his back but was "unable to because of [Plaintiff's] lack of insurance."  (AR 31.)

7       The VE testified that Plaintiff's former position performing shipping and receiving was

8   semi-skilled and performed as heavy or very heavy per the Plaintiff's testimony and work record.

9   (AR 33.) Plaintiff's skills were not transferrable.  (AR 34.)  The ALJ asked the VE whether a

10  hypothetical person of Plaintiff's age, education and work background could perform Plaintiff's past

11  relevant work if that person could lift 10 pounds frequently and 20 pounds occasionally; could sit,

12  stand, and walk six hours in an eight-hour day with a sit/stand option; and could occasionally stoop,

13  crouch, crawl, climb, and squat.  (AR 34.)  The VE testified that a hypothetical person could not

14  perform Plaintiff's past relevant work because he could only perform light work, but could perform

15  light sedentary work with a sit/stand option, including jobs such as a linen supply load builder, a

16  garment sorter, and an ampoule filler.  (AR 34-35.)

17      The ALJ's second posed hypothetical was the same as the first, but with the  added use of

18  a cane for prolonged ambulation.  (AR 35.)  The VE stated that there would be no changes.  (AR 35.)

19  The  ALJ's third hypothetical person could perform sedentary work; could lift 10 pounds frequently

20  and occasionally; could sit for six hours and could stand/walk for two hours in an eight-hour day;

21  could occasionally, stoop, crouch, crawl, climb, and squat; and required a cane for ambulation.  (AR

22  35.)  The VE testified that since there was no sit/stand option indicated, that person could perform

23  the "full world of sedentary, unskilled" work.  (AR 36.)  The ALJ's fourth hypothetical indicated that

24  the person would be "limited to no postural activities."  (AR 36.)  Although both the ALJ and the

25  VE found the limitation to be "strange," the VE testified that such a limitation was not "compatible

26  to any work."  (AR 36-37.)

27      Plaintiff's counsel proposed a hypothetical based on the ALJ's first hypothetical, but adding

28  that the person would potentially miss one to two days per month of work due to physical

impairments.  (AR 37.)  The VE testified that missing one day of work a month was "close," but missing two days was "going to close the road of work as normally found."  (AR 51.)  Plaintiff's counsel proposed an additional hypothetical based on the ALJ's first hypothetical but adding the limitation that the person needed to elevate his leg while sitting.  (AR 38.)  The VE testified that there would be no work available.  (AR 38.)  Plaintiff's counsel then proposed a hypothetical based on the ALJ's second hypothetical of requiring a cane, but adding that the person had to lean on it for balance.  (AR 39.)  The ALJ testified that the hypothetical individual would then use the cane for "support," which would put the person "outside of competitive labor" and "the world of work [would be] closed."  (AR 39.)

**C.    ALJ's Decision**

On September 10, 2010, the ALJ issued a decision finding Plaintiff not disabled since December 18, 2006, the date of Plaintiff's application.  (AR 103-14.)  Specifically, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since December 18, 2006, the date of application; (2) Plaintiff had "severe" impairments of status post displaced left fracture with open reduction internal fixation, status post left ankle wound debridements, lumbar degenerative disc disease, and obesity based on the requirements in the Code of Federal Regulations; (3) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the RFC to lift and carry 10 pounds occasionally and frequently, stand and walk two hours in an eight-hour day, sit six hours in an eight-hour day, occasionally stoop, crouch, crawl, climb, and squat, and needed a cane for ambulation; (5) Plaintiff was unable to perform past relevant work; (6) Plaintiff was defined as a younger individual on the date the application was filed; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) the transferability of job skills was not material to the disability determination because Plaintiff was "not disabled" under the Medical-Vocational Rules whether or not Plaintiff had transferrable job skills; (9) there were jobs that existed in significant numbers in the national economy that Plaintiff could perform; and (10) Plaintiff had not been under a disability as defined in the Social Security Act since December 18, 2006, through the date of the decision.  (AR 108-14.)

1    Plaintiff sought review of this decision before the Appeals Council.  On November 3, 2010,

2    the Appeals Council denied review.  (AR 3-5.)  Therefore, the ALJ's decision became the final

3    decision of the Commissioner.  20 C.F.R. § 416.1481.

4    **D.    Plaintiff's Contentions on Appeal**

5    On December 28, 2010, Plaintiff filed a complaint before this Court seeking review of the

6    ALJ's decision.  (Doc. 1.)  Plaintiff contends that the ALJ erred by improperly considering the

7    medical record, specifically the opinions of treating physician Dr. Weldon and examining physician

8    Dr. Van Kirk.  (Doc. 14.)

9                        **III.  SCOPE OF REVIEW**

10    The ALJ's decision denying benefits "will be disturbed only if that decision is not supported

11    by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

12    1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

13    of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

14    determine whether the Commissioner applied the proper legal standards and whether substantial

15    evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d

16    909, 911 (9th Cir. 2007).

17    "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

18    *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

19    relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

20    *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

21    305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

22    the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

23    may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

24    *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

25                        **IV.  APPLICABLE LAW**

26    An individual is considered disabled for purposes of disability benefits if he or she is unable

27    to engage in any substantial, gainful activity by reason of any medically determinable physical or

28    mental impairment that can be expected to result in death or that has lasted, or can be expected to

1    last, for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A); *see also*

2    *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from

3    anatomical, physiological, or psychological abnormalities that are demonstrable by medically

4    accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant

5    is not only unable to do his previous work, but cannot, considering his age, education, and work

6    experience, engage in any other kind of substantial, gainful work that exists in the national economy.

7    42 U.S.C. § 1382c(a)(3)(B), (D).

8         The regulations provide that the ALJ must undertake a specific five-step sequential analysis

9    in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the

10   claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).

11   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

12   or a combination of impairments significantly limiting him from performing basic work activities.

13   *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the

14   claimant has a severe impairment or combination of impairments that meets or equals the

15   requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*

16   §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

17   has sufficient RFC despite the impairment or various limitations to perform his past work.  *Id.*

18   §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show

19   that the claimant can perform other work that exists in significant numbers in the national economy.

20   *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in

21   the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094,

22   1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

23   **V.  DISCUSSION**

24   **A.**      **The ALJ's Consideration of the Medical Opinions of Dr. Weldon and Dr. Van Kirk**

25        Plaintiff contends that the ALJ failed to properly consider the medical evidence and relied

26   on stale medical records and manufactured inconsistencies to support the decision.  (Doc. 14,

27   8:22-15:10.)  Defendant contends that the ALJ properly rejected the opinions of Dr. Weldon and Dr.

28   Van Kirk.  (Doc. 15, 6:8-11-4.)

12

### 1. Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).[4] The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2. The ALJ Properly Rejected the Conclusory Opinion of Dr. Weldon that Plaintiff was Disabled

Plaintiff contends that the newly developed evidence showed that Plaintiff had a continuing infection, which did not improve as expected and was, in fact, disabling. (Doc. 14, 9:9-11.) Plaintiff

[4] Defendant's argument implies that the standard set forth in *Lester* is improper and should not be considered by the Court. Defendant contends:

Notwithstanding the standards and rules set forth by Congress and the Commissioner, the Ninth Circuit directs that an ALJ provide "clear and convincing" reasons to reject the opinion of a treating physician when that opinion in uncontradicted. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). To the extent the Ninth Circuit's judicially-created standard exceeds the requirements set forth by Congress and by the Commissioner at the behest of Congress, it would appear to be improper.

(Doc. 15, 7:22-25.)

Defendant's argument that *Lester* sets forth an improper reviewing standard has no merit. The Ninth Circuit's decision in *Lester* – as with every published Ninth Circuit decision – is binding on this Court, regardless of whether a party believes it was incorrectly decided.

asserts that Dr. Weldon's treatment notes indicated a slowly healing scar, significant ankle swelling, and an open wound; as such, Dr. Weldon's opinion that Plaintiff was disabled was supported by the medical evidence. (Doc. 14, 11:1-11.) Defendant contends that Dr. Weldon's ultimate conclusion that Plaintiff was disabled was an issue reserved for the Commissioner, Dr. Weldon cited no objective clinical findings to support his conclusion, and his conclusion was inconsistent with the objective findings. (Doc. 15, 7:2-14, 8:3-10.)

The ALJ considered Dr. Weldon's opinion and determined that:

> Dr. Arnold Weldon wrote a To-Whom-It-May-Concern letter stating the claimant suffered from chronic left ankle pain status post open reduction and internal fixation and chronic wound infection requiring treatments from time to time. It appeared that his condition was stable and stationary, but disabling . . . . I have given careful consideration to this opinion. However, because this opinion about the claimant's ability to perform past work or any works concerns an issue reserved to the Commission and is not an opinion as to the nature and severity of the claimant's impairment, it cannot be accorded special weight (20 CFR §§ 404.1527(c), 416.927(c), and Social Security Ruling 96-5p). Dr. Weldon's belief that the claimant is unemployable is a conclusory statement and does not include specific work-related limitations or the medical evidence to support the cause of the limitations. It is unknown whether Dr. Weldon considered the entire work world when making his statement or just the claimant's past work.

(AR 112.)

Plaintiff was treated by Dr. Weldon between February 19, 2008, and May 14, 2010. (AR 417-35, 453-81.) During that time, Dr. Weldon reported that Plaintiff's left ankle had swelling and tenderness with palpation. (AR 417-35, 453-81.) On December 17, 2008, Dr. Weldon noted that Plaintiff had an "open sore" on his ankle "measuring 1 cm x 0.5 cm in diameter with some serious drainage." (AR 418.) By February 11, 2009, Dr. Weldon reported that Plaintiff's "left ankle pain and drainage stopped a few days ago" but that there was a "scab at the site of the opening" and that "unfortunately, the pain increased," although it was not explained how the ankle pain could have both "stopped" and "increased." (AR 453.) Dr. Weldon noted swelling and tenderness, but no drainage, of the ankle. (AR 453.) There do not appear to be any other reports of open wounds of Plaintiff's ankle in Dr. Weldon's treatment notes. (*See* AR 417-35, 453-81.)

During the time when Plaintiff's wound was healing, on January 13, 2009, Dr. Weldon wrote a letter addressed "To Whom It May Concern." (AR 417.) Dr. Weldon's letter stated: "Mr. Sammy Martinez has suffered from chronic left ankle pain status post open reduction and internal fixation.

14

The patient is also suffering from chronic wound infection requiring treatments from time to time. It appears that his condition to be (sic) stable, stationary, but disabling." (AR 417.)

The ALJ rejected Dr. Weldon's conclusion of Plaintiff's disability as being an "issue reserved to the Commissioner." (AR 112.) Defendant correctly asserts that it is the Commissioner who is responsible for making the determination of whether a claimant meets the statutory definition of a disability. 20 C.F.R. § 404.1527(e)(1); Social Security Ruling ("SSR") 96-5p.[5] Opinions on issues reserved for the Commissioner are not considered medical opinions. 20 C.F.R. § 404.1527(e). "[E]ven when offered by a treating source, [opinions on whether an individual is disabled] can never be entitled to controlling weight or given special significance." SSR 96-5p.

Further, the ALJ correctly noted that "Dr. Weldon's belief that the claimant is unemployable is a conclusory statement and does not include specific work-related limitations or the medical evidence to support the cause of the limitations. It is unknown whether Dr. Weldon considered the entire work world when making his statement or just the claimant's past work." (AR 112.) Plaintiff contends that the ALJ's decision is "perplexing" because "Dr. Weldon's narrative opinion is attached to 22 pages of treatment notes as obvious support of his opinion." (Doc. 14, 11:20-22.) However, Dr. Weldon treatment notes provide no explanation as to how he determined that Plaintiff was disabled or what functional restrictions Plaintiff had when it came to work.

While Dr. Weldon's treatment notes repeatedly indicate that Plaintiff's ankle was "swollen" and "tender to palpation," they do not indicate his functional limitations. (*See* AR 418, 420, 422, 425, 427, 433, 435, 453, 457, 462, 464, 466, 470, 472, 474, 476, 478, 480.) Further, Dr. Weldon only made cursory statements regarding Plaintiff's ability to work. On February 19, 2008, Dr. Weldon noted that Plaintiff was "[a]dvised to apply for SSI due to the fact that []he state []he cannot work." (AR 433.) As such, this does not appear to be an opinion rendered by Dr. Weldon but an acceptance of Plaintiff's own determination regarding his ability to work. Dr. Weldon further noted that Plaintiff indicated that the orthopedic surgeon told him that he will "have to live with" the pain

---

[5] SSRs are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding precedent upon ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

and that "no specific treatment was recommended." (AR 433.) However, Dr. Weldon does not appear to recommend a specific treatment either, other than prescribing pain medication. (AR 433; *see also* AR 422, 424, 427, 470 (indicating that Plaintiff's visits were for medication refills.) On June 1, 2009, Dr. Weldon states that "[t]he patient is not able to work" but again provides no explanation as to how that determination was made. (AR 478.)

"The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). Dr. Weldon's treatment notes consistently indicate "minimal swelling," "mild tenderness," and "trace edema." (AR 352, 354, 457.) Further, even when Dr. Weldon noted that Plaintiff's ankle showed "quite a bit of swelling and tenderness," the next visit appears to indicate that Plaintiff only complained about back pain. (AR 422, 425.) Dr. Weldon's longitudinal findings indicate mild symptoms related to Plaintiff's ankle; any reports of symptoms that were more severe appeared to be short-term and non-lasting. Dr. Weldon does not indicate how the mild objective findings regarding Plaintiff's ankle condition are consistent with a determination that Plaintiff is unable to work.

It is appropriate for an ALJ to consider the absence of supporting findings and the inconsistency of conclusions with the physician's own findings in rejecting a physician's opinion. *Johnson v. Shalala*, 60 F.3d 1428, 1432-33 (9th Cir. 1995); *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam). If a doctor's conclusions are not consistent with his own findings, that is a specific and legitimate reason for rejecting that opinion. *See Young*, 803 F.2d at 968 (treating doctor's conclusory opinion that claimant was disabled was properly rejected by ALJ when it was internally inconsistent and not consistent with doctor's prior medical reports).

Additionally, Defendant correctly notes that much of Dr. Weldon's determination was based on Plaintiff's subjective reports of pain, which the ALJ determined to be "not credible" and not as extensive as the "degree alleged." (AR 111.) Plaintiff did not challenge the ALJ's credibility

finding, and thus has waived this argument.  See *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (explaining that arguments not raised before the district court are generally waived).  Because Dr. Weldon's opinion was premised on Plaintiff's non-credible subjective complaints, his opinion was unreliable.  *See Bayliss*, 427 F.3d at 1217.

As such, the ALJ correctly determined that "Dr. Weldon's belief that claimant is unemployable is a conclusory statement" that lacked "specific work-related limitations" and "medical evidence to support the cause of the limitations." (AR 112.)  The ALJ thus properly rejected Dr. Weldon's findings.

### 3.      The ALJ Did Not Provide Specific and Legitimate Reasons to Reject the Opinion of Dr. Van Kirk

Plaintiff contends that the limitations imposed by examining physician Dr. Van Kirk do not allow for the performance of any work activity as testified by the VE. (Doc. 14, 12:6-9.)  Defendant contends that the ALJ properly rejected Dr. Van Kirk's opinion as being internally inconsistent. (Doc. 15, 10:6-20.)

The ALJ considered Dr. Van Kirk's opinion and determined that:

> Dr. Van Kirk opined the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for four hours in an 8-hour period if he could sit down every 45 minutes to rest for 5 to 10 minutes, sit for four hours in an 8-hour day if he could get up every half hour to reposition himself, should not climb, balance, stoop, kneel, crouch, and crawl, or be required to work in any cold and/or damp environment.  He should use his lumbosacral corset for his back and left ankle brace, and use his quad cane, perhaps on the right side instead of the left side . . . . However, Dr. Van Kirk's evaluation conflicts with his medical source statement, which concluded that claimant could lift and carry up to 50 pound occasionally and 20 pounds frequently and never crawl, crouch, kneel, stoop, push with the left foot, or climb ladders or scaffolds . . . .  I find Dr. Van Kirk's opinions internally inconsistent and are given little weight; however, I accept Dr. Van Kirk's opinion that the claimant needs to use his quad cane for walking.

(AR 112.)  The ALJ further noted that during Dr. Van Kirk's physical examination, Plaintiff "appeared to be in no acute distress" but nonetheless "moaned and groaned throughout the examination." (AR 109.)  Further, Plaintiff "appeared to exaggerate moderate to a marked degree his symptoms, mainly his back and also left ankle." (AR 109.)

The ALJ gave Dr. Van Kirk's opinion "little weight" because it was "internally inconsistent." (AR 112.)  The ALJ correctly notes the inconsistency between Dr. Van Kirk's opinion that Plaintiff

1  "should be able to lift and carry 10 pounds frequently and 20 pounds occasionally" (AR 442) and

2  the finding that Plaintiff could occasionally lift between 21 to 50 pounds, frequently lift 11 to 20

3  pounds, and continuously lift up to 10 pounds (AR 444).

4       The ALJ further indicated that Dr. Van Kirk's opinion that Plaintiff was "limited to no

5  postural activities" (AR 442) was inconsistent with the finding that Plaintiff could perform some

6  postural activities such as occasionally climbing stairs and ramps and frequently balancing (AR 447).

7  However, while Dr. Van Kirk opined that Plaintiff could occasionally climb stairs and ramps and

8  could balance, the doctor also found that Plaintiff could "never" climb ladders or scaffolds, stoop,

9  kneel, crouch, or crawl.  (AR 447.)  As such, the ALJ's implication that there was an inconsistency

10 between Dr. Van Kirk's findings is not supported – there is no inconsistency between Dr. Van Kirk's

11 opinion that Plaintiff *could not perform postural activities* and his finding that Plaintiff *could never*

12 *perform certain postural activities*.  These are essentially identical findings.[6]

13      Although the ALJ noted that Plaintiff "moaned and groaned throughout [Dr. Van Kirk's]

14 examination" and that Plaintiff "appeared to exaggerate" his condition, the ALJ's only reason for

15 rejecting Dr. Van Kirk's opinion is that it was "internally inconsistent."  (AR 109, 112.)  Plaintiff

16 correctly asserts that the ALJ's reason for rejecting Dr. Van Kirk's opinion as being "internally

17 inconsistent" does not apply to the findings regarding the postural limitations involving stooping,

18 crawling, crouching, or kneeling, as those findings were, in fact, internally consistent.  As the ALJ

19 provided no other reason for rejecting Dr. Van Kirk's opinion, the reason provided by the ALJ was

20 not specific and legitimate.  *See Lester*, 81 F.3d at 830-31.

21      The Court cannot conclude that such error is non-prejudicial.  Plaintiff contends that if Dr.

22 Van Kirk's postural limitations were credited, then the VE determined that there would be no work

23 available.  (Doc. 14, 14:18-24.)  At the hearing held on August 26, 2010, the VE was questioned

24

25      [6] The Court recognizes that there was an inconsistency in Dr. Van Kirk's opinion that Plaintiff was "limited to
26 no postural activities" and his finding that Plaintiff could "occasionally" climb stairs and ramps and could frequently
   balance.  (AR 442, 447.)  However, Dr. Van Kirk was *consistent* with his opinion that Plaintiff "was limited to no
27 postural activities" and his finding that Plaintiff could "never" stoop, kneel, crouch, crawl, or climb ladders or scaffolds.
   (AR 442, 447.)  It is these *consistent* opinions, specifically the postural limitations that Plaintiff could never stoop, kneel,
28 crouch, crawl, which impact the ALJ's analysis and undermines the ALJ's finding that Dr. Van Kirk's opinions were
   "internally inconsistent."  (AR 112.)

regarding the availability of jobs if "the claimant is limited to no postural activities." (AR 36.) Upon the VE's request for clarification, the ALJ identified that the postural limitation included no stooping, crouching, or crawling; ALJ and the VE found the limitation to be "a strange one" and "[v]ery, very strange." (AR 36-37.)  Although there appeared to be some confusion regarding the limitation, the VE testified that the limitation would not be "compatible to any work."  (AR 37.) As such, if Dr. Van Kirk's postural limitation of no stooping, crouching, or crawling is credited, the VE testified that such limitation would preclude any work.  (AR 37.)

Plaintiff further asserts that SSR 96-9p provides that "[a] complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply."  However, SSR 96-9p also states that a "restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work" and that "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping."

The ALJ's decision indicated that the VE determined Plaintiff "would be able to perform the requirements of the world of sedentary unskilled work."  (AR 113, *see also* AR 36.)  This determination was based on the ALJ's ultimate RFC finding that Plaintiff could lift and carry 10 pounds occasionally and frequently; stand and walk two hours in an eight-hour day; sit six hours in an eight-hour day; occasionally, stoop, crouch, crawl, climb, and squat; and required a cane for ambulation.  (AR 35, 110.)  However, the ALJ did not properly reject Dr. Van Kirk's opinion that Plaintiff could *never* climb ladders or scaffolds, stoop, kneel, crouch, or crawl, and thus the RFC determination that Plaintiff could *occasionally*, stoop, crouch, crawl, climb, and squat is unsupported.  Accordingly, the ALJ does not provide a sufficient basis for relying on the VE's finding that Plaintiff could perform the "world of sedentary unskilled work" since that finding fails to account for any erosion that would occur if Dr. Van Kirk's opinion is credited.  As such, the ALJ

1    failed to meet the burden of Step Five to show that Plaintiff can perform other work that exists in

2    significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).[7]

3          Defendant's contention that the ALJ could rely on Dr. Lee's September 2007 opinion that

4    Plaintiff could return to work in October 2007 fails to account for two years worth of treatment in

5    the record that occurred after October 2007 and further fails to account for the ALJ's improper

6    rejection of Dr. Van Kirk's March 2009 opinion that Plaintiff could never stoop, kneel, crouch, or

7    crawl. (AR 112, 397, 442, 447.)  The Court expresses no opinion as to whether there were other

8    reasons that the ALJ could have rejected Dr. Van Kirk's opinion, including Plaintiff's noted

9    exaggeration during the examination. (AR 109, 440.) However, the only the reason provided by the

10   ALJ to reject Dr. Van Kirk's opinion was that it was "internally inconsistent."  (AR 112.)  This

11   reason was not specific and legitimate in that there was no inconsistency in Dr. Van Kirk's opinion

12   that Plaintiff was limited to "no postural activities" and his finding that Plaintiff could "never" stoop,

13   kneel, crouch, and crawl.  (AR 440, 447.)

14   **B.    Remand Is Required**

15         The ALJ did not provide sufficient reasons based on substantial evidence in the record to

16   discount the opinion of Dr. Van Kirk with regard to Plaintiff's postural limitations.  Generally,

17   "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating

18   or examining physician, [the Court credits] that opinion as 'a matter of law.'"  *Lester*, 81 F.3d at

19   830-34 (finding that, if doctors' opinions and plaintiff's testimony were credited as true, plaintiff's

20   condition met a listing (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989))).  Crediting

21   an opinion as a matter of law is appropriate when, taking that opinion as true, the evidence supports

22   a finding of disability.  *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

23

24   ───────────────

25     [7] The Court notes that the VE did identify specific jobs that Plaintiff could purportedly perform – specifically
     linen-supply load builder (DICOT No. 920.687-118), garment sorter (DICOT No. 222.687-014), and ampoule filler
26   (DICOT No. 559.685-018).  These jobs do not require the ability to climb, balance, stoop, kneel, crouch, or crawl.
     However, these jobs were based upon an RFC that was less restrictive than the RFC ultimately adopted by the ALJ in
27   that Plaintiff would be required to sit, stand and/or walk six hours in an eight-hour day and lift 20 pounds occasionally
     and 10 pounds frequently as opposed to standing and/or walking only two hours in an eight-hour day and only lifting
28   10 pounds frequently and occasionally. (AR 34, 110.) Since the RFC adopted by the ALJ was more restrictive, the Court
     cannot consider the applicability of these jobs.

Courts retain flexibility, however, in applying this crediting-as-true theory. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there were insufficient findings as to whether plaintiff's testimony should be credited as true). "In some cases, automatic reversal would bestow a benefits windfall upon an undeserving, able claimant." *Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1278 (C.D. Cal. 1996) (remanding for further proceedings where the ALJ made a good-faith error in that some of his stated reasons for rejecting a physician's opinion were legally insufficient).

Here, the ALJ erred because the stated reasons for rejecting a portion of Dr. Van Kirk's opinion is not legally insufficient. "Such good faith errors inevitably will occur. Reasonable judicial minds sometimes will disagree regarding proper application of the rather imprecise standard of 'specific, legitimate' reasons." *Barbato*, 923 F. Supp. at 1278. "[U]nder the rule in *Lester*, the [medical] opinion will trigger benefits whenever the ALJ's previously stated reasons for rejecting the opinion fall short of the ill-defined 'specific, legitimate' standard." *Id.* (footnote omitted). "A reviewing court should have discretion to avoid this inequitable result by remanding the case for further administrative proceedings. Remand necessitates delay, but the cost of this delay should be balanced against the risk of an erroneous determination." *Id.*; *see also McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (remanding for further proceedings because Secretary of Health and Human Services was in better position than court to point to evidence in record to provide specific, legitimate reasons to disregard treating physician's opinion).

Accordingly, the Court exercises its discretion to remand this case to the Commissioner for further proceedings. *See McAllister*, 888 F.2d at 603 (holding that court may remand to allow ALJ to provide the requisite specific and legitimate reasons for disregarding medical opinions).

## VI. CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Samuel P. Martinez and against Defendant Michael J. Astrue, Commissioner of

///

1    Social Security.

2

3    IT IS SO ORDERED.

4    **Dated:   March 19, 2012**                      **/s/ Sheila K. Oberto**
                                           UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28